House Bill 2014-31 City of Painesville at all v. Elizabeth Goodwin May it please the court, I'm Timothy Reed, counsel for the appellants in this case. I'd like to request four minutes for rebuttal. This case arises and is before the court on good faith community and immunity defenses. There are a number of defendants still involved in the case and our position is that the evidence as construed by Judge Wells, a factual interpretation by Judge Wells, or the trial judge missed on a few points. I'd like to address some of those points. The record is fairly substantial and in the background is an overview is that police were called to this address. They conferred with the people at the address and told them to keep the noise down. There's no dispute about that. The police came back when they heard more noise and on the way back they came into contact with a lady who said she was threatened by a person in the apartment. Judge Wells looked at that issue about the threat before the two officers went back. The two officers called for backup. When they went back, they contend that they advised Mr. Knoll that he was under arrest to submit to a taser and that he declined to do so and that he made a fist at them and basically gave them a motion to come on and get me. The taser was deployed. The officers have a version of it. Mrs. Knoll, who was in the apartment, has a different version of it. If we can just focus in before we get into the details of the facts, if there is a fact dispute under Johnson v. Jones, do we not lack jurisdiction to consider your appeal? When you look at the facts here, the trial judge looked heavily at unrebutted facts that were there. One of the unrebutted facts was that the witness who complained that she was assaulted gave an affidavit. The trial court felt that maybe there were questions about the affidavit because it was given sometime after she had been stopped for a DUI. That fact is uncontested, that the witness gave an affidavit. As a matter of fact, the evidence here shows that, so what I'm saying is, the fact is uncontroverted that she gave an affidavit and that she complained to the police. If the trial judge thinks, well, maybe there's a question about that because there's some... that that witness gave the affidavit within days of the DUI matter. And there's a very simple answer to that. Okay. If you look at the DUI charge that was submitted by plaintiff, she did the breathalyzer and it came out to .01, which isn't even under the influence in the state of Ohio. That's why the charges were dismissed. The breathalyzer record is in the record. The basic question that I still don't feel that I understand your answer is, if there are factual issues that you are challenging, so here you're challenging Judge Wells' belief that there are credibility issues that could weaken the value of that affidavit. Why under Johnson v. Jones doesn't the Supreme Court say to us, we, the Court of Appeals, do not have jurisdiction because of the genuine issue of material fact? I think the facts are clear. There's no dispute about the fact that an affidavit was done. There's no dispute about the fact that that witness complained of an assault, which led to the police to believe there were exigent circumstances. That issue is not in dispute. It's the trial court's interpretation of what that fact meant, which is in dispute. So our contention is, you can look at that de novo and see what actually happened here. Now, the investigation of this had witnesses interviewed that night. There's a 25-page police incident report. They went out. They took photographs. This same witness was interviewed that night and is part of the record, and she gave a statement that night that comports with her affidavit. I think the trial court felt, well, somehow we had control over that witness. We had no more control over that witness than any of the other witnesses there. Plaintiffs would have had every opportunity to take her deposition and show that what she said was not true, but her version, the report she gave that night is in the police report. Her witness statement is there. The police recorded it themselves. Each police officer there gave a statement, and in terms of the facts here, we're not arguing the facts. What we're saying is the facts are clear that she gave that statement, and that taints all of the actions that the police officers took. They're given information, and the trial judge says this, that this witness said that she was assaulted and Mr. Knoll threatened to kill people in the apartment. Let's assume that we'reólet's put Johnson aside, and let's assume that we're notóyou're not addressing whether there is this dispute of material fact. What this second Graham factor looks to is whether there's a significant threat to the safety of the officers or others, and wasn't what the judge below said that I don't think that this is resolved by the presence of Ms. Petroska's affidavit for more than one reason. Because of the issue with the, what do they call it, the summons for operatingóin that state it's operating a motor vehicle under the influence, and then the subsequent dropping of that within two days of making an affidavit, but also the fact that there was an officer engaged in this activity who had turned off his recorder, for which he had previously beenóI don't want to say punished, but previously been the occasion of a reprimand for failure to turn it on, and so he knew he was supposed to be recording. And then third, that even after Ms. Petroska came and said, this is what Mr. Knoll is doing, and this is what he did to me in the apartment, their testimony is not that they went to arrest him for a felony, but that they went to arrest him for disorderly conduct, which the officer himself says is nothing. So you've got more than one factual issue that calls into credibility this officer's testimony. Part of that decision by the attorney court, though, in applying these facts was that, well, they never charged him with a felony. They said they were going to get him. The man was in a coma. They weren't going to bring him into court and charge him. Originally the officeró No, but this was contemporaneous testimony. This was even more significant because the officer says, I'm going to go arrest this guy for disorderly conduct. So we are in the arena of a charge that he considers nothing, and what that impacts is whether the officer believed that there was a significant risk of harm to officers or others. And isn't that indicative that the officer himself does not believe that there's a significant risk of harm? The officers have testified here that they did feel there was a significant risk. But they've also testified that they were not going to arrest him for anything other than disorderly conduct, even in light of the testimony and affidavit of Ms. Petroska. That's correct. They did testify to that. But that doesn't mean that they weren't concerned about harm to people in the apartment, and it also doesn't mean that the affidavit of Petroska is not correct or that her statement to the police that night is not correct or that her witness statement is not correct. So all of those issues then may appropriately relate to the court's determination of the second graham factor, correct? That's correct. Okay. But our position here is that the officers at the time thought there was a threat, they thought they acted appropriately, and it's the objective, is there some objective reasonable belief that they have to act? And they felt they did. Now whether they can voice it in terms of should we have charged him with something else, should we have charged him with resisting arrest, should we have charged him with physical violence, what should we have charged him with? But doesn't our Dawson case say that summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of that witness? Yes. But if you look at some of the defendants that are still in this case, for instance, Officer Collins has testified that he heard the taser shot. He's still in the case in the trial court. He's in a failure to protect Klein, though, correct? Right. He said it took him 20 to 25 seconds to get up the stairs after he heard it. There's no evidence that as he's in the room there that he had any idea of whether the taser was still engaged or not. So he had no ability to stop Officer Soto from whatever Soto was doing. And if you look closely at what he says in his deposition, he had to go through the same door. The process here is you have to open the door and then close the door behind you to get in. This whole space is actually the diagram shows it's probably less than 6 feet by 6 feet. So if you look at Officer Collins, there is no indication that he even had an opportunity to stop Soto from whatever Soto was doing. And all three officers said that there was resisting arrest. It's a given fact that this individual did not have his hands behind his back. They couldn't get them behind his back for whatever reason. There's no dispute that he is. The witness was to take the facts in the light most favorable to the plaintiff. And the plaintiff is being tased, and there's witness testimony that he was convulsing. So how could that be resisting arrest? Well, the basis for them saying that he could not put his hands behind his back is the article from someone who was attached to the plaintiff's brief that says, we did some studies. If you tase someone in the back, it incapacitates them from putting their arms behind their back. But the concept of the taser is that it incapacitates you from resisting. And the testimony here is he was resisting. Now, whether he's resisting or he just can't do it, the officers don't necessarily know that at the time. But I would like the court to look certainly at some of these defendants, including Hughes, who says, I didn't even know if the taser barbs made contact or not. So the overflow here is if you find that Soto should not have done what he did, that doesn't mean that there isn't sufficient evidence to let the other officers out. And I see that your red light is on. Thank you. If you want to save your rebuttal time, that's fine. Good morning. Al Gerhardstein for the Apple Lee. Becky Knoll is here today. And I'd like to start with the failure to protect claim. We have Hughes and Collins both trying to cuff Mr. Knoll while he's on the ground. In his deposition, Hughes said at page 33, which is page ID 1506, that I asked him, so the type of resistance that you experienced from his arm was consistent with the effects of the taser. Yes. So he may well not have given his arm up because the electricity was still flowing through his upper torso. Correct? Yes. So Hughes knew that he was rigid because he was being energized. And Collins said the same thing in his deposition when I asked him that at page 52. So Collins is document 42 in the deposition in the record, and Hughes is 44. Your opponent was saying that Collins thought it took him 20 to 25 seconds to get there. How does this fit in? Collins was there, and he was one of the people who cuffed Knoll. So Knoll was still being energized when Collins is in the room. The taser creates a really distinctive clattering sound, very loud. So if he's being energized, Collins is hearing it. And Collins says, at page 52 of his deposition, that Mr. Knoll would have been incapable of responding to a verbal command that he put his hands behind his back. And that's no big surprise because training officer Lynch said that's what happens. Training officer Smith said that's what happens when they were deposed. These men were all trained by those folks. And that's one of the problems with a 21-second trigger pull to get us back to SOTO. You're only supposed to do a 5-second burst, and you're supposed to cuff under power. So the whole theory is that the backup officer comes in, cuffs as soon as that 5-second burst is done. Because you don't want them to be energized while you're trying to cuff them because they'll still be rigid. And so by doing a 21-second trigger pull, they're pulling on a guy who is totally incapable of responding. And this was so obvious, talk about reasonableness, that Robin McKenzie, sitting on a sofa, calls the police on the police. And she says in her 911 call, they're saying stop resisting, but he can't stop resisting because he's not resisting, he's being shocked. So even a total pedestrian to this whole notion of tasing could tell that Mr. Nall was incapable of putting his arms back. This has been a core contested fact since the beginning of this case. It remains a core contested fact. So do we have jurisdiction under Johnson v. Jones to hear this appeal? You don't. But I want to talk about this because I've been doing these cases for 38 years. I was around before Mitchell v. Forsythe. And now we've gotten to the point where every excessive force case takes an extra year. You're getting faster. I mean, the Sixth Circuit is moving its docket better. And this case isn't unduly delayed, but this is going to take another year. So let me suggest one thing. We filed our motion to dismiss this appeal two days after they filed the notice of appeal. The district court order has 13 really dramatic contested issues of fact that haven't been really undone through the course of the appeal. What I'm suggesting is that when we move to dismiss appeals like this, the court should look at the record from the district court like you do for all the other issues. But instead what we're getting are opinions like the one here from the motion panel that says, well, let's see how the briefing goes. Well, why do they get to undo their failure to accept the facts in the light most favorable to the nonmoving party in the court of appeals? You're looking at a done record. And, in fact, we just got a decision in the Baker case where the court said in the reply brief the appellant has finally accepted the facts in the light most favorable to the nonmoving party. Well, we never got to reply to that. Now, we prevailed, and if you say you don't have jurisdiction, technically we're prevailing here. But we get nothing on the merits, so there's no help for the jury instruction. We're delayed a year, and we knew this back at the time we filed the motion to dismiss. I mean, I'll stop my speech, but I'm suggesting that when these motions are filed, at least the court should be looking to the record as it existed in the district court rather than giving the appellants another bite at the apple. Or else you end up with a situation like this where we're standing here arguing facts. And we shouldn't do that on a motion for summary judgment. And there's another huge fact, which is right at the door. The only thing we agree on in this case is that this is one weird apartment because the door into the apartment opens in a way that blocks your ability to go into the living room. So you're standing in the hallway talking to the officer, which, by the way, distinguishes this case on the entry. You'll know that Becky Nall's criminal case was dismissed on a motion to suppress because the entry was viewed as not being consistent with exigent circumstance jurisprudence. And we have Mr. Nall standing there right in the hallway. So if this is the door, it's swung this way. The living room's over here to my right. And he needs to close the door at least somewhat in order to go into the living room. He's done talking to the officers. Could he be somewhere else in the house? Now, there's a hall to the back, but nobody argues that he really went that way. And all his guests were in the living room. So he goes to leave, and Becky Nall says he's totally in the living room. She's sitting on the sofa. He turns around to face the officer who follows him in, and is tased right there in front of her and then falls down. The officer claims that he tases him while Mr. Nall is in the hallway. This is a big deal. I mean, are you tasing from the entranceway and from the landing where the officer's standing? Or have you really marched right in like Becky Nall says? Well, the physical evidence, and the judge picked up on this, is that the barbs hit him on the right side. Now, again, the door opens this way. He's walking this way. How'd the barbs get over here if it wasn't when he was fully exposed to the officer? And the officer claims that he's already running away when the officer tases him. And I didn't know whether my taser really caught or not. Well, that clacking's not going to happen unless you've made contact. Is there evidence in the record that there's always clacking? There is evidence in the expert reports. And Becky Nall says she heard the clacking. Colin says he heard it. In fact, Colin says, because he's late coming up, he's only there for a while while he's resting, and he says, I knew where they were because I heard the clacking. So he follows the clacking. Your opponent argues that the clacking is only what happens when you first depress the trigger. That's not correct. And the record reflects in the testimony that the clacking is continuous? You know, I can't cite a page. I can tell you that I deposed two training officers, and I suspect that I asked that. And I apologize. I just don't know. I can also tell you if you go and do any YouTube video of a taser. That would not be in the record. No, you aren't going to do that. But at any rate, I think I did cite to a URL, though, in our brief, that would allow you to see what a taser does when it's in motion. The other thing that's going on in this case is we've got a series of affidavits that were filed by the officers after they were deposed. And those affidavits continually are cited by the defense counsel in support of their argument that there are contested issues of material fact. One of the facts that they have in those affidavits is the term actively resisting, as if they can make a fact out of something that's really a legal term, magic words from the case law. We cite to the actual contested testimony when I was deposing the officers. I think it's inappropriate to file affidavits after the officer's been deposed. I can't then re-depose them. Then they try to create contested issues of fact out of that. The district court sorted through all that and really did rely on the evidence in the record, the exhibits, the police reports, and the actual deposition testimony. And I just caution that when these affidavits float in on top of all that, they have the least weight or should have the least weight since nobody can really challenge them. And the same is true of Prochaska. I think she was manipulating the officers. I think that there's something going on with her. We couldn't find her to depose her. Then they get an affidavit from her. This is the type of stuff that happens when you have cases like this, and this is why they need to be tried because we've got to put all these people up in front of a jury. And what you find then is that there really is a very good reason to affirm the district court, both on the entry, which was not supported by probable cause. There was no exigent circumstance. There was no felony. And they came in with this. The noise complaint. And they used the noise complaint for the community caretaker argument, which they raised for the first time in the court of appeals. So I don't think it was in the officer's head that they were doing any community caretaker function. And none of the community caretaker cases involve subjects that actually come to the door and talk to the officer. I mean, they can assess right there what's going on. And if they wanted to talk to Becky Knoll again because she came to the door the first time, they could have said, Ma'am, would you come to the door also? We'd like to just check, make sure everybody's okay. There were other people in the apartment. They could talk to them. Nobody was throwing them off the landing. And the idea that they could rush into the apartment over the objection of the owner of the apartment or the renter of the apartment under the community caretaker exception is not supported by the case law in any way. When you're speaking of apartment, one factual issue that confused me, is this like a house with multiple families, two-family, three-family house that's typical? Yeah, it's a two-family. There's a bottom and there's a top. So it's not a big apartment house with 20 or 30 apartments. No, you're right. And his entrance from the outside is from a landing that is outside. And you'll see that in the photographs. I think Exhibit 10 are the diagrams of the apartment. Exhibit 27 has the landing. And there are a couple other exhibits that actually are photographs of the apartment, both the outside and the inside. The other contested issue, in fact, beyond the entry, is the whole excessive use of force. As I mentioned, there's a big debate about where the tasing actually occurred. And, of course, that matters as to whether it's appropriate. And there's a huge debate about whether it's ever right to do a 21-second trigger pull. I mean, the record is very clear that a 5-second trigger pull is what's recommended. And you're supposed to assess. If you look at the Taser training materials that we've got in the record, you're supposed to assess, is everything okay? Do I need to use another strategy? What about the argument that the officers make that they didn't know that the Taser was operating the whole time? That's outrageous. They have both been trained by Lynch and by Smith, who were both deposed. And Lynch and Smith said, well, we trained them that they're supposed to know that when you pull the trigger, it's still energizing. And then you have the noise, which is pretty distinctive. And then you have the effect on the subject, who is curling up. And you can see visibly that he's rigid and that he's foaming at the mouth to the point, as I say, where even a pedestrian, a civilian in the room, calls the police on the police. So the idea that they didn't know may be true, but it's not a reasonable mistake then. I mean, it's one thing. I've turned down cases where an officer is in a rapidly evolving situation, he goes to shoot the suspect, and he hits a bystander. That's a reasonable mistake. You're doing the best you can, you're trying to stop the robber, you screw up, and you hit a bystander. That's a mistake that I can't sue over. But a mistake where you're doing something you were trained not to do for longer than you're supposed to be doing it, 21 seconds, and then remember that after that 21-second trigger pull, he does an energizing additional 5 seconds by pressing the cartridge against the back, which sends the energy around the whole torso. They knew exactly what they were doing, and they were using way too much electricity on this individual, and it, as you see, caused dramatic injury. I mean, he's mentally incapacitated. He used to be a really great artist and a stonecutter, and now he plays with G.I. Joes and needs help getting dressed. I mean, this is exactly what these officers were warned against when they were trained, that you can cause major disruptions to the breathing and to the organs if you overdo it. And they were told that 15 seconds is overdoing it. So let's say for some reason they go past the 5, they go past the 10, then they go past the 15, they're up to 21. They are killing him, and it's not a reasonable mistake for them to claim that 21 seconds is, and the fact that the taser was ongoing. Hughes and Collins were there with enough time to stop. They were right there at the body trying to get him cuffed. They experienced the rigidity. They should have said, turn off the taser. Does the rigidity end when the taser stops? Yes. Yeah, it does. And that would have given them... That's in the record somewhere, too. Yes. Again, I can't cite to a page, but I think I walked those training officers through all the stuff that happens and how you're supposed to do it, and the training slides from the PowerPoint that Taser International sends out are all in the record. So you get to see all that. Your red light is on, so if you want to draw yourself to a conclusion. All right. All I'll say is that we do hope that you will affirm the district court. There are contested issues of fact here that should send this back to trial. Thank you. Thank you. I'm not foolish enough to believe that some of this... Counsel, you have moved for summary judgment and qualified immunity. Are you saying based on this record there are no genuine issues of moral fact that are in dispute? As to some of the officers, I understand that some of this case is going to go back for trial, but as to some of the officers, in particular Collins, I owe an obligation to raise that issue because Collins' testimony was he heard the pop, and when the taser goes off, there is a pop. That doesn't tell you if the taser actually is in contact with something, and the officers, Hughes and Soto, both said, we didn't know if it made contact. They knew when they saw Mr. Now on the ground, didn't they? Well, Soto has testified that he did not know that there was actually contact with both barbs until Soto came into contact with one of the wires. It's not unusual when the taser is fired, the one that is right by the laser goes straight. The other one, we're never sure where it's going. The man fell down and is foaming at the mouth and is in convulsions, according to other witnesses. So this just happened to him because the taser didn't connect to him? Well, we have an expert report that's submitted to our pleadings from a medical doctor and also from an expert in toxicology that says his condition was not related to the taser at all. But the officers have said... You mean the foaming at the mouth and the falling down and the convulsions just happened to happen at the same time that the taser was deployed in the air? We've submitted medical evidence to that point. But your question is, do factual issues preclude finding for any of the defendants on good faith immunity? That's why I'm asking the court, I would like you to look at Collins, who said he heard the pop go off. There's nothing in his deposition that says that it was continuing to go. It took him 20 to 25 seconds to get up the steps and get there. And Hughes has testified that he did not know whether there was any contact or not. Hughes thought it took him 30 seconds to get to the plaintiff. So in some of the defendants, yes, I contend that their testimony, especially Collins, and I think Hughes also, should entitle them on the facts that the trial court found to good faith immunity defense. What about the second taser? The second taser... Were Collins and Hughes present when the second taser was used? Collins doesn't remember it, and Hughes said he did not know. What they're both doing in this confined space is each of them is trying to take an arm back. And they're saying that they're not watching to see what somebody else is doing because they all felt that there was resistance. So what is Soto's testimony as to when and why he used the second taser? Was it because of Collins and Hughes having difficulty handcuffing? Soto didn't know that Collins was there at the time. It's unclear if Soto knew when Collins came in. But all three of them, isn't the testimony agreed among all three of them that they were all three ordering him to put his hands behind his back and be handcuffed? I mean, this is all going on at the same time. Well, there's a 15-second delay between the stop of the one taser and then the drive stun. So there's a schedule in there that shows what the time was, but they all felt that there was resistance. Well, they were there, and they were participating if they felt there was resistance. Didn't your opposing counsel give us deposition citations that were these two officers' comments on what was happening in the resisting? Yes, but they're affidavits when the deposition is over. Well, I would have to suggest that under our law, you cannot alter deposition testimony through the expedient of filing a subsequent affidavit. You would agree with me on that, would you not? I agree. But a lot of times what happens in the deposition is you're not going to ask the question of why did this happen, why did that happen. You're going to limit it to cross-examination. So the affidavits may be more complete. We're not altering any of their testimony by these affidavits, and it hasn't been suggested that we did. And that's why sometimes the affidavits will offer more information than the depositions themselves. But I would ask the court to look at both Hughes and Collins, and in particular Collins. There's just no basis to hold him in this case. And my obligation is to raise that issue to try and get him out as soon as I can. I realize most of this case is going back for trial. Thank you. Thank you both for your argument. The case will be submitted with the court call.